**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

VICTORIA B.,[1]
    Plaintiff,

       v.                                  Civil No. 3:22-cv-00157 (MRC)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
    Defendant.

**MEMORANDUM OPINION**

       This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for a period of disability and disability insurance benefits under the Social Security Act ("Act"). At the time of her application date, Plaintiff was fifty-two years old and previously worked as a fast-food cook. (R. at 307, 343.) Plaintiff alleges she is unable to work due to diabetes, depression, a hearing impairment, back pain, and gastrointestinal problems. (R. at 107.)

       On June 21, 2021, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 18.) This matter comes before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1), on cross-motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Memorandum Opinion, and will further restrict

1

For the reasons set forth below, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 17), GRANTS Defendant's Motion for Summary Judgment (ECF No. 19) ("Def.'s Mem."), and AFFIRMS the final decision of the Commissioner.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on July 27, 2018, alleging disability beginning January 1, 2014. (R. at 307.) The SSA denied Plaintiff's claim on February 22, 2019, and upon reconsideration on May 8, 2019. (R. at 158, 166, 170.) Plaintiff requested a hearing before an ALJ, and a hearing was held on January 9, 2020. (R. at 40-81, 173.) On February 14, 2020, the ALJ issued a written opinion, finding that Plaintiff was not disabled under the Act. (R. at 137-48.) On November 2, 2020, the SSA Appeals Council remanded the case back to the ALJ for further evaluation of Plaintiff's allegations with respect to Listing 2.10 (Hearing Loss Not Treated with Cochlear Implantation). (R. at 154-55.) Plaintiff appeared with counsel and testified at a second administrative hearing on May 20, 2021, which was limited in substance to the subject matter set forth in the SSA Appeals Council's remand order. (R. at 87-105.) At the second hearing, Plaintiff moved to amend her alleged onset date to November 1, 2018. (R. at 91.)

On June 21, 2021, the ALJ issued a written decision finding Plaintiff not disabled under the Act. (R. at 21-33.) On December 17, 2021, the SSA Appeals Council denied Plaintiff's request for review of the ALJ's June 21, 2021 decision. (R. at 7-11.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

---

its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does

not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. *Id.* § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. *Id.* § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. *Id.* § 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. *Id.* § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 23-33.) *See* 20 C.F.R. § 404.1520(a)(4); *Mascio v. Colvin*, 780

F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date, November 1, 2018, through her date last insured, December 31, 2018. (R. at 23.) At step two, the ALJ determined that Plaintiff's "hearing loss without cochlear implant and diabetes" constituted severe impairments pursuant to 20 C.F.R. § 404.1520(c). (R. at 23.) At step three, the ALJ determined that Plaintiff did not have an impairment, individually or in combination, which met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26.)

Between steps three and four, the ALJ determined Plaintiff's residual functional capacity. (R. at 27.) Based on the evidence in the record, the ALJ determined that Plaintiff retained the ability to perform light work with the following limitations:

> [Plaintiff] can lift and carry 20 pounds occasionally and less than 10 pounds frequently, stand and walk for a combined 6 out of 8 hours, sit for a combined 6 out of 8 hours, and would have push/pull limited by only her lift/carry; could climb ramps and stairs without limitation, but could never climb ladders, ropes or scaffolds; would be able to balance occasionally, would be unlimited in kneeling and crouching, and could crawl and stoop occasionally; would be able to perform no work requiring exposure to workplace hazards such as unprotected heights and dangerous machinery; would be able to perform work which would permit her to request repetition of instructions at the time the original instructions were given due to possible difficulties hearing; would be able to perform work requiring exposure up to the quiet noise level as defined by the DOT and/or SCO; would be able to perform work which would permit her to eat food on breaks due to her diabetic condition; would be able to perform work requiring no exposure to wetness or humidity in the performance of her job duties due to possible effects on the functioning of her hearing aids; able to perform work that did not require the ability to hear audible timers, beepers, signals, etc. in performance of her work; would be able to perform work that did not require telephone communications or which could be performed using a telephone or other audiovisual communications so long as that equipment had a volume control; and she would be able to

> perform work which permitted a sit/stand option at will while remaining productive at her workstation.

(R. at 27.) The ALJ explained that she determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." (R. at 27.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (R. at 31.) At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. at 32-33.) In making her findings, the ALJ considered the testimony of a vocational expert, who opined that given Plaintiff's age, education, work experience, and residual functional capacity, she would be able to perform the requirements of router. (R. at 32.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (R. at 33.)

## IV. ANALYSIS

Plaintiff alleges two issues necessitate remand. (Pl.'s Mem. Supp. Summ. J. at 8, 12 ("Pl.'s Mem.").) First, Plaintiff argues that the ALJ failed to account for time off task for Plaintiff to manage her diabetes by injecting insulin "as much as 5-times per day" and test her blood sugar level "3-times a day." (Pl.'s Mem. at 8.) Second, Plaintiff contends the ALJ erred by failing to account for her mild mental limitations in the residual functional capacity. (Pl.'s Mem. at 12.)

Defendant responds that the ALJ's decision should be affirmed because: (1) the ALJ sufficiently accounted for Plaintiff's diabetes management by "buil[ding] in time for Plaintiff to eat during regular breaks throughout the workday"; and (2) any additional time off task is not supported by the evidence in the record. (Def.'s Mem. at 10-11.) Second, Defendant argues that the ALJ was not obligated to include further functional restrictions in the residual functional

6

capacity to account for Plaintiff's mild mental limitations, and substantial evidence supports the ALJ's residual functional capacity findings. (Def.'s Mem. at 13-17.) For the reasons that follow, the Court finds that the ALJ did not err, and substantial evidence supports her residual functional capacity findings.

### A. The ALJ Did Not Err By Declining to Assess Additional Time Off Task and Substantial Evidence Supports the ALJ's Residual Functional Capacity Findings.

Plaintiff first argues that the ALJ erred by failing to account for additional time off task for Plaintiff to manage her diabetes, specifically, by injecting insulin "no less than 3-times per day, but as often as 5-times per day," and "self-test her blood sugar levels . . . ." (Pl.'s Mem. at 8.) Defendant responds that the ALJ reasonably determined that Plaintiff did not require additional time off task and already accounted for Plaintiff's need to manage her diabetes by "building in time for Plaintiff to eat food on breaks . . . ." (Def.'s Mem. at 10.) Defendant adds that the record does not support Plaintiff's contention that she needs to inject herself and check her blood sugar so often to preclude work altogether, and that substantial evidence supports the ALJ's residual functional capacity findings. (Def.'s Mem. at 10-11.)

*1. Plaintiff's Diabetes Treatment.*

Plaintiff was diagnosed with type two diabetes in 1994 and began treating with an endocrinologist during the relevant period.[3] (R. at 827.) During an appointment on November 28, 2018, Plaintiff told her doctor that she checked her blood glucose levels "3 times daily and [was] maintaining a very good log." (R. at 827.) Plaintiff explained that she maintained a healthy diet, ate three meals a day, and tried to limit her carbohydrates to 50 grams daily. (R. at 827.) She also reported that she "[i]ntermittently has hypoglycemia in the morning, postprandial hyperglycemia

---

[3] The undersigned notes that the relevant period at issue is roughly two months: November 1, 2018 (Plaintiff's amended alleged onset date) to December 31, 2018 (Plaintiff's date last insured).

7

in the evening." (R. at 827.) Plaintiff was instructed to continue taking her medication and to inject insulin according to the following: "8 units before breakfast, 8 units before lunch and 8 units before dinner . . . ." (R. at 828, 833.)

On February 25, 2019, after the relevant period, Plaintiff treated with her primary care physician, who noted that Plaintiff experienced hypoglycemia "less frequently" and that it occurred "when she is physically active." (R. at 936.) In March 2019, Plaintiff continued to check her blood glucose three times a day and was "maintaining a very good log." (R. at 972.) Plaintiff was instructed to continue injecting insulin as follows: "10-12 units before breakfast, 10-12 units before lunch and 10-12 units before dinner . . . ." (R. at 973.)  In July and October 2019, Plaintiff was again instructed to inject insulin according to this schedule. (R. at 1010, 1089.) In October 2019, Plaintiff's provider noted that she had "difficulty understanding the concept of low-carb diet despite counseling multiple times. She [was] on liquid calories which is causing fluctuation in the blood glucose." (R. at 1088.) Plaintiff reported that she checked her blood glucose levels two to three times each day but was instructed to check it four times daily and to administer insulin before each meal. (R. at 1088, 1091.)

    2. *Plaintiff's Testimony and Function Reports.*

Plaintiff discussed her diabetes management during the administrative hearing on January 9, 2020. (R. at 52.) Plaintiff told the ALJ that she took "three shots a day" and needed to eat to prevent her sugar levels from dropping. (R. at 52.) Plaintiff explained that her previous employer at a fast-food restaurant permitted her to have a fifteen minute break to eat food. (R. at 52.) However, Plaintiff quit her job because it was difficult for her to eat regularly as well as stand continuously for long durations. (R. at 52-54.) She noted that her subsequent job at another fast-food restaurant allowed her to take a half-hour break to "get something to eat and sit down [to] eat

[it]." (R. at 60-61.) The ALJ asked her to clarify that her "need to eat and [having] problems standing on [her] feet" were "two of the things . . . [that] make it difficult or prevent [her] from working[,]" to which Plaintiff responded:

> Yes, and I didn't take care of myself like I should . . . . When I got home, I was famished . . . . I wanted to eat everything in sight, because I didn't really – on my break, I ate something, but then – and I had something to drink throughout my shift. I was able to have a drink in the back . . . .

(R. at 61.)

Plaintiff further testified that her blood sugar level fluctuated despite taking her medicine as instructed. (R. at 72.) She explained that it was often too low if she did not eat enough, took too much insulin, or a combination of both. (R. at 72.) When her blood sugar level was low, Plaintiff took glucose tablets and ate candy. (R. at 72.) On November 18, 2018, Plaintiff completed a function report in which she explained that she tested her blood glucose levels: (1) upon waking; (2) after breakfast; (3) after lunch; and (4) at dinnertime. (R. at 352, 359.) She "take[s] insulin twice" and "take[s] pills twice." (R. at 359.)

> 3. *The ALJ Did Not Err When She Declined to Provide Additional Time Off Task for Plaintiff to Inject Insulin and Test Blood Glucose Levels.*

In her decision, the ALJ considered Plaintiff's subjective complaints about her diabetes and its impact on her ability to work. (R. at 28.) She noted how Plaintiff testified that:

> [S]he was no longer able to work due to her diabetes and needing to take three shots per day. She also needs to eat often. She decided to leave work because her need for shorter hours was not accommodated. [Plaintiff] had problems standing on her feet due to neuropathy . . . . She also indicated that her blood sugar levels fluctuate.

(R. at 28.) The ALJ determined, however, that Plaintiff's "statements about the intensity, persistence, and limiting effects of his or her symptoms, [] are inconsistent because objective

9

medical evidence indicates that her impairments are not as limiting as alleged." (R. at 28.) The ALJ went on to evaluate Plaintiff's medical treatment records pertaining to her diabetes before, during, and after the relevant period. (R. at 29.) The ALJ noted that Plaintiff tolerated her medication, monitored her blood glucose levels at home, and had mostly normal physical examination findings. (R. at 29.) The ALJ acknowledged that Plaintiff's vibratory sensation was diminished during one foot examination but noted that she "had normal sensation of the feet bilaterally, and a normal gait." (R. at 29, citing R. at 704, 829, 839.) Moreover, the ALJ found that Plaintiff's "diabetes was noted as improving and controlled." (R. at 29, citing R. at 702, 709, 735.)

In addition to the medical treatment records and Plaintiff's subjective complaints, the ALJ considered the medical opinion evidence from state agency medical consultants Eugene Noland, M.D. ("Dr. Noland") and David Bristow, M.D. ("Dr. Bristow").[4] Both doctors reviewed the medical evidence and found Plaintiff capable of performing light work. (R. at 30, citing R. at 115, 129.) The ALJ explained that she found these opinions "generally persuasive" because they were "supported by a review of the evidence of record." (R. at 30.) Accordingly, the ALJ concluded that "the evidence does support limitations due to bilateral hearing loss and diabetes" and determined that the opinions of Dr. Noland and Dr. Bristow were "persuasive to the extent that they are consistent with [Plaintiff]'s residual functional capacity." (R. at 31.)

Subsequently, the ALJ concluded that, "[d]ue to the limitations resulting from the symptoms of [Plaintiff's] physical impairments, she can perform light work." (R. at 31.) The ALJ added that Plaintiff needed to be "able to perform work that would permit her to eat food on breaks due to her diabetic condition," and which provided for "a sit/stand option at will while remaining

---

[4] The ALJ also considered opinion evidence from two state agency psychological consultants. (R. at 30.) However, the Court will limit its summary of the opinion evidence only to those opinions relevant to Plaintiff's diabetes and its impact on her ability to perform work-related activities.

10

productive at her workstation." (R. at 27, 31.)

Upon review, substantial evidence supports the ALJ's decision not to include additional time off task for Plaintiff to inject insulin and check her blood glucose levels. Indeed, the medical treatment records and Plaintiff's own testimony suggest that she injected insulin three times per day, with varying units at times, and that she checked her blood glucose between three to four times per day. Further, as the ALJ aptly identified, Plaintiff testified that her diabetes impacted her ability to work because it required her to take breaks to eat food to control her fluctuating glucose levels. (R. at 28; *see* R. at 52-54, 60-61.) It was reasonable, then, for the ALJ not to include any additional time off task for Plaintiff to inject herself with insulin and check her blood glucose levels because the record, including Plaintiff's own admissions, does not support any such finding.

However, Plaintiff cites to case law she contends is persuasive on this issue, writing that the holding in *Noa v. Berryhill*, No. 17-cv-05147-MEJ, 2018 U.S. Dist. LEXIS 59362 (N.D. Cal. Apr. 6, 2018) is analogous, as it also considered the issue of time off-task for diabetes management in a claimant's residual functional capacity.  (Pl.'s Mem. at 8.) In *Noa*, the Northern California District Court held that the ALJ erred in her residual functional capacity findings by not accounting for the time the claimant "would be off-task when she injected herself up to six times a day or tested herself up to four times a day." 2018 U.S. Dist. LEXIS 59362, at *29.

In that case, the Court noted that the claimant's diabetes was "not-well controlled" and that she was "prescribed insulin glargine injections (Lantus) twice a day, Victoza injections once a day, insulin lispro (Humalog) injections three times a day (once in the morning, once at lunch and once at dinner), and testing for blood sugar levels four times a day . . . ." *Id.* at *24. Further, the vocational expert in *Noa* estimated that the claimant would be off-task more than fifteen percent of the day when accounting for the hypothetical need for three, twenty-minute unscheduled breaks

to administer her medications and check her blood sugar level. *Id.* at *25-26. Subsequently, the Court held that it was error for the ALJ to be presented with such evidence, but fail to inquire:

> [A]bout the impact of this condition on [the claimant's] ability to work a full day: for example, asking [the claimant] about the frequency and type of effects she experienced if she did not timely inject herself; when [the claimant] injected herself or tested herself, and how many of her six daily injections or her four daily blood tests would need to be given during regular work hours; or the amount of time it would take to complete the process at work . . . .

*Id.* at *27.

The present matter is distinguishable from *Noa*. First, the ALJ in this case was not presented with the same evidence in *Noa* regarding unmanaged diabetes and the injection regimen; in fact, the testimony by Plaintiff in the present matter demonstrates that Plaintiff's diabetes management was relatively normal, and that any complications arising from her condition were due to not having adequate time to eat during the workday, not from her need to inject herself or test her blood sugar levels. (R. at 60-61.) Importantly, Plaintiff resolved this problem by quitting her job and finding new employment that provided adequate time "to take a break, a half-hour break . . . to get something to eat and sit down and eat that." (R. at 60-61.)

Further, there is no evidence in the record suggesting that Plaintiff's diabetes management required the same level of care needed by the claimant in *Noa*. Here, the record routinely shows that Plaintiff was directed to test her blood sugar level three to four times daily and to inject insulin three times daily before every meal. (R. at 827-28, 833, 973, 1088, 1091.) Indeed, as Defendant points out, the majority of Plaintiff's medication management occurs outside of normal work hours and not while at work. (Def.'s Mem. at 10-11 (citing R. at 359, 833, which indicate that Plaintiff administers insulin injections and checks her blood sugar level once during lunch, but at other times before breakfast and dinner).) Moreover, Plaintiff testified that she complied with her diabetes medication regimen, and when her blood sugar level was low, she managed it by taking

12

glucose tablets and eating candy. (R. at 72.) Finally, the vocational expert in *Noa* estimated that the claimant would be off-task more than fifteen percent of the day when accounting for a hypothetical need for three, twenty minute unscheduled breaks. *See* 2018 U.S. Dist. LEXIS 59362, at *25-26. In the present matter, the vocational expert testified that a hypothetical individual who, *inter alia*, needed to be able to eat food on breaks "due to her diabetic condition" could perform work existing in substantial numbers in the national economy. (R. at 77-78.) Further, as noted above, the ALJ appropriately accounted for Plaintiff's diabetes management by limiting her to work that permitted her to eat food during scheduled breaks. (R. at 27.)

Though Plaintiff argues that *Noa* is persuasive generally as a holding requiring an ALJ to account for time off-task due to diabetic medication management, the undersigned does not read *Noa* so liberally. Rather, the *Noa* court explicitly held that remand was necessary because the ALJ failed to develop the record on this issue when the record contained evidence regarding the claimant's need for time off-task. 2018 U.S. Dist. LEXIS 59362, at *30. Significantly, however, the *Noa* court wrote that it was unwilling to:

> [R]emand the decision for immediate payment of benefits, as there is no evidence that Plaintiff's medication regimen would make her off task more to the degree where she would become unemployable. Plaintiff has not identified any evidence, and the Court has found none, describing how long Plaintiff's injection and testing regimen takes.

2018 U.S. Dist. LEXIS 59362, at *30. Here, Plaintiff has similarly failed to identify evidence in the record to meet her burden of showing that her insulin injections and blood glucose testing prevent her from engaging in any substantial gainful activity existing in the national economy. *See* 42 U.S.C §§ 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require"); *Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986) (explaining

13

that a claimant must show that her impairment must be accompanied by functional limitations that preclude her from performing any substantial gainful activity).

Instead, Plaintiff merely alleges that the ALJ's "failure to account for additional breaks and time off task to administer insulin shots and test blood sugar levels is error." (Pl.'s Mem. at 11.) Plaintiff contends that the ALJ was "on notice of the extensive number of times [she] needed to inject insulin, as this issue was flagged at the outset of the hearing that was conducted on May 20, 2021[,]" but nonetheless "ignore[d] the fact that [Plaintiff] is medically required to inject insulin up to 5-times a day and test blood sugar levels 3-times a day." (Pl.'s Mem. at 11.) In support of her contention, Plaintiff does no more than suggest that "the combination of Plaintiff's mild limitations in concentration, persistence, and pace, coupled with the additional time off task related to administering insulin up to 5-times a day and testing blood sugar up to 3-times a day, could certainly be work preclusive." (Pl.'s Mem. at 10.) Yet, Plaintiff does not object to the ALJ's determination that Plaintiff had a mild limitation in this area of mental functioning, nor does she point to evidence in the record demonstrating how her injection and testing regimen should have factored meaningfully in the ALJ's analysis of Plaintiff's mental impairments. Indeed, Plaintiff failed to report to her medical providers that such testing and injecting significantly impacted her concentration, persistence, or pace to the extent that it renders her disabled. Instead, Plaintiff told the ALJ that her diabetes presented an obstacle in maintaining gainful employment because she found it difficult to find time to eat and maintain her blood glucose levels. (R. at 52-54, 60-61.)

Therefore, the undersigned finds that the ALJ appropriately accounted for Plaintiff's credibly established limitations caused by diabetes in the residual functional capacity when the ALJ addressed Plaintiff's need to eat during breaks and have a sit/stand option. (R. at 27.) Accordingly, the ALJ did not err, and substantial evidence substantial evidence supports the ALJ's

residual functional capacity findings.

### B. The ALJ Was Not Required to Incorporate Plaintiff's Mild Limitations in the Residual Functional Capacity.

Plaintiff also contends the ALJ erred by not incorporating her mild limitations into the residual functional capacity. (Pl.'s Mem. at 15.) In her decision, the ALJ evaluated the four broad mental functioning areas and determined that Plaintiff had only mild limitations. (R. at 25-26.) Plaintiff does not contend that the ALJ should have assigned greater restrictions to any of these functional categories but asserts that the ALJ was nonetheless obligated to provide for these functional limitations in the residual functional capacity. (Pl.'s Mem. at 15.) Plaintiff cites to unpublished district court opinions within the Fourth Circuit in support of her contention that the ALJ was required to impose mental limitations in the residual functional capacity. (Pl.'s Mem. at 13.) Plaintiff also cites to case law from outside the Fourth Circuit as persuasive authority that mild limitations in concentration, persistence, and pace "in combination" with time off task "could render [her] unemployable." (Pl.'s Mem. at 15 (citing *Freed v. Kijakazi*, No. 20-CV-1012, 2021 U.S. Dist. LEXIS 178352 (E.D. Wis. Sep. 20, 2021); *Hovi v. Colvin*, No. 12-C-169, 2013 U.S. Dist. LEXIS 108595 (W.D. Wis. Aug. 2, 2013); *Alesia v. Astrue*, 789 F. Supp. 2d 921 (N.D. Ill. 2011).) Thus, Plaintiff argues that the Commissioner's final decision would have been different had the ALJ sufficiently accounted for Plaintiff's mild limitations in concentration, persistence, and pace in conjunction with Plaintiff's need for additional time off task to manage her diabetes. (Pl.'s Mem. at 16.)

However, established decisions from the Fourth Circuit and the Eastern District of Virginia do not support Plaintiff's contentions. *See e.g., Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015); *Kimberly G. v. Comm'r of Soc. Sec.*, Civil Action No. 2:21-cv-45, 2021 U.S. Dist. LEXIS

255364, at *31 (E.D. Va. Dec. 7, 2021) (collecting cases). Indeed, the *Mascio* Court "indicated that *moderate*—not mild—limitations must be either accounted for in the [residual functional capacity] or alternatively explained." *Kimberly G.*, 2021 U.S. Dist. LEXIS 255364, at *31 (citing *Mascio*, 780 F.3d at 638) (emphasis in original). This Court has routinely declined to extend this requirement to mild limitations. *See, e.g., Camille B. v. Kijakazi*, No. 20-cv-262, 2021 U.S. Dist. LEXIS 176667, at *13 (E.D. Va. Sept. 15, 2021); *Eva L. v. Saul*, No. 20-cv-0162, 2020 U.S. Dist. LEXIS 173652, at *64 (E.D. Va. Sept. 22, 2020); *Younger v. Berryhill*, No. 18-cv-182, 2019 U.S. Dist. LEXIS 126935, at *13 (E.D. Va. June 21, 2019) ("*Mascio* did not provide that remand was required when the ALJ failed to give an explanation in the presence of mild limitations only."), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS 126956, 2019 WL 3451305 (E.D. Va. July 29, 2019).) Indeed, the court in *Younger v. Berryhill* declined to extend the holding in *Mascio* to mild limitations and rejected the "mildly persuasive authority" that extended the requirement in other districts. 2019 U.S. Dist. LEXIS 126935, at *13 n.5. Accordingly, the undersigned is inclined to find the same, and concludes that the ALJ was not required to incorporate Plaintiff's mild limitations in the residual functional capacity.

Lastly, Plaintiff adds that the ALJ's failure to include Plaintiff's mild limitation concentration, persistence, and pace in the residual functional capacity impacts the ALJ's step four finding that Plaintiff could perform her past relevant work as a fast-food cook. (Pl.'s Mem. at 16.) Plaintiff contends that "if the ALJ properly considered the Plaintiff's mild limitations in the [residual functional capacity] the ALJ would have been constrained to find the Plaintiff could not perform these semiskilled and skilled jobs." (Pl.'s Mem. at 17.) As Defendant points out, however, Plaintiff is substantively wrong on this point because the ALJ determined, at step four, that Plaintiff could *not* perform her past relevant work as a fast-food cook. (R. at 31; Def.'s Mem. at 14 n.3.)

Consequently, the undersigned finds no error warranting remand on this issue.

## V. CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary Judgment (ECF No. 17), GRANTS Defendant's Motion for Summary Judgment (ECF No. 19), and AFFIRMS the final decision of the Commissioner. The case is now CLOSED.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: March 20, 2023